**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| LORRI SUE WILDI, | ) | |
| | ) | |
| | ) | CIVIL ACTION NO. 08-284 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALLE-KISKI MEDICAL CENTER part of | ) | |
| The West Penn Allegheny Health System, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.

Pending before the court is a motion for summary judgment (Doc. No. 22) filed by

defendant Alle-Kiski Medical Center ("defendant" or "Alle-Kiski") seeking judgment in

defendant's favor with respect to all claims asserted by plaintiff Lorri Sue Wildi ("plaintiff" or

"Wildi"), a former vice-president of operations of defendant.  Plaintiff filed a complaint asserting

two counts (Doc. No. 1). Plaintiff asserts claims for (1) unequal pay in violation of the Equal Pay

Act, 29 U.S.C. § 206(d) (the "Equal Pay Act") and (2) retaliation in violation of 29 U.S.C.

§215(a)(3) of the Fair Labor Standards Act, 29 U.S.C.A. § 201 *et seq.* ("FLSA"), after Wildi was

fired subsequent to complaints related to the Equal Pay Act.

### *Factual Background*

Defendant Alle-Kiski is a medical facility that is part of the West Penn Allegheny Health

System. Cindy Schamp ("Schamp") became the CEO of Alle-Kiski in the spring of 2003.

(Defendant's Statement of Material Facts not in Dispute ("DSMF") ¶ 2[1].) Plaintiff began

working for Alle-Kiski in 1983 as director of operations. By the fall of 2003, plaintiff was

promoted to the position of vice-president of operations. (DSMF ¶ 1.)  Plaintiff had a masters

degree in public management and her bachelor's degree in health planning and administration.

(DSMF ¶ 26.)

Schamp was president and CEO of Alle-Kiski during the duration of Wildi's employment

as vice-president. (DSMF ¶ 4.) Schamp made recommendations for restructuring a new

organizational team for the West Penn Allegheny System in 2003 after she was hired. (DSMF ¶

5.)  Schamp created four vice-president positions, one of which was filled by Wildi. The other

three vice-presidents were Michael Harlovic ("Harlovic"), the vice-president of patient care

services; George Sandora ("Sandora"), the vice-president of business operations and director of

finance; and Bill Englert ("Englert"), the vice-president of operations and business development.

All vice-presidents were members of defendant's senior management team.  Other members of

the senior management team were Arthur Jackson Davis ("Davis"), the director of human

resources, and Radha Kambhampati, M.D. ("Kambhampati"), the vice-president of medical

affairs. (Def.'s Mot. for Summ. J., Ex. B ("Wildi Dep.") at 41; DSMF ¶ 2.)

**Plaintiff's Salary Concerns**

Vice-presidents were compensated with a combination of base salaries and executive

bonuses. The bonuses were generated based upon an evolving compensation formula determined

by the performance of the overall organization. (Def.'s Mot. for Summ. J., Ex. C ("Schamp

---

[1] The Joint Concise Statement of Material Facts consists of defendant's statement of material facts not in dispute with plaintiff's answers in section I, containing paragraphs 1 through 46 on pages 1 through 13, and plaintiff's statement of material facts not in dispute with defendant's answers in section II, containing paragraphs 1 through 102 on pages 14 through 40.  To avoid any confusion that could arise from the duplicative paragraph numbers, citations to the joint statement will be referenced as "DSMF" or "PSMF" followed by the appropriate paragraph number.

Dep.") at 38-39.)  The health system generated a pool of funds for bonuses, which was later divided into individual bonuses. (*Id.*) Schamp would evaluate the goals set out by each vice-president and determine which individual goals furthered the overall performance of Alle-Kiski the most. (*Id.*) Schamp recommended what percentage of the pool should be allocated to each vice-president. The bonuses were set as a percentage of the base salary.

When the vice-presidents first assumed their positions, they all made the same base salary of $103,001.60. (DSMF ¶ 7.)  Despite receiving an identical salary in 2004, the vice-presidents received different bonus compensation. In 2004, Harlovic and Sandora each received a bonus of $30,000.00, Englert received a bonus of $28,000.00, and Wildi received a bonus of $26,000.00. (PSMF ¶ 36; Schamp Dep. at 38-39.)

In 2005, the bonuses increased for each individual. Harlovic and Sandora each received $35,000.00, Englert received $31,900.00, and Wildi received $28,800.00. (PSMF ¶ 40.) The next year, 2006, was a less robust financial year and the bonuses decreased slightly for each employee. Harlovic received $31,300.00, Sandora $31,100.00, Englert $29,500.00, and Wildi $23,000.00. (PSMF ¶ 45.)

By 2007, the salaries of the four vice-presidents continued to diverge. The base salaries, which were the same from 2004 through 2006, were no longer identical. The base salaries were: (1) Harlovic – $133,348.80, (2) Sandora – $126,723.20, (3) Englert – $114,192.00, and (4) Wildi – $113,360.00. (PSMF ¶ 46.)  In addition, all four received executive bonuses. (PSMF ¶¶ 51-52.) That year, Harlovic earned the largest bonus measured in either percentage of base salary or in total dollar amount; Wildi earn the smallest bonus measured either in terms of percentage or dollar amount. (*Id.*)

Schamp testified that even though Wildi and Englert had comparable jobs, Englert received a higher merit bonus because Wildi experienced some work setbacks. (Schamp Dep. at 55.) Wildi struggled with core laboratory transition in 2007, which was one, but not the sole, benchmark for why Wildi earned a lower merit bonus. Schamp factored in feedback from the system team members and meetings with other departments. (*Id.*)

Defendant contends that Harlovic and Sandora consistently made more money because the pool of individuals qualified for a chief financial officer and chief nurse executive positions were particularly small. (Schamp Dep. at 59-61.) According to Schamp, the positions held by Harlovic and Sandora required more on-the-job experience and additional licenses such as CPA and nursing licenses. (*Id.*)  Schamp testified that Englert's position was not like the other members of the team, and therefore, his salary was not comparable to the other vice-president positions. (*Id.* at 59.)

**Formal Complaints to CEO**

In 2004, plaintiff began to suspect that her salary was lower than her male counterparts and also lower than what other vice-presidents made in similar jobs. Through her contact with her colleagues, plaintiff felt there was a serious salary discrepancy. (Wildi Dep. at 50.)  Plaintiff testified that, in discussing issues with Englert with respect to market compensation:

> We had discussed the fact that based on our relationships that we had with colleagues within the system and information that he had and, of course, I had through my travels, that Alle-Kiski Medical Center vice presidents were paid less than other vice presidents with similar or equal duties and responsibilities, skill sets, et cetera, at our sister facilities.

(Wildi Dep. at 52.)  When comparing her own salary to those of neighboring facilities such as West Penn Hospital, Allegheny General, and Forbes Regional, Wildi felt that she, along with her

colleagues, were not paid their market value and consequently were paid less than vice-presidents at those other facilities. (Wildi Dep. at 52.)

Wildi became frustrated that she was making less money than her male counterparts, whose jobs she perceived were equal to her job. (*See Id.*)  On April 26, 2007, Wildi made a direct complaint to Schamp. (Wildi Dep. at 61-62.) Wildi expressed three concerns. First, she requested a salary review. She sought a salary review because she "was being paid less than [her] counterparts on the senior team, *all of whom were male*, for positions of similar, if not the same, duties, responsibilities, qualifications, et cetera."  (*Id.* (emphasis added).) Second, she raised her concerns that individuals in positions similar to hers in the West Allegheny Health System were paid a higher salary. Third, Wildi asserted that her salary was not comparable to what the market salary was for her skill set. (*Id.*) Schamp promised to undertake a salary review for Wildi, but did not take action with respect to the situation. (*Id.*)  Plaintiff and Schamp specifically discussed gender pay inequities.  (Wildi Aff. ¶ 25.)

On July 2, 2007, Wildi again raised the salary issue with Schamp. (Wildi Dep. at 63.) Wildi had not heard back from Schamp concerning the matter and was following up on her complaint. (*Id.*) Schamp stated that she would follow up with John Lasky ("Lasky") about the matter. (Wildi Dep. at 63.) Lasky was the new vice-president of human resources at that time. (*Id.*) Wildi reiterated her concerns over gender inequity in pay among the members of the senior team.  (Wildi Aff. ¶ 28.)

On September 17, 2007, Wildi approached Schamp about the salary review. Schamp had not taken action with respect to the matter. Wildi expressed frustration and concern that she had waited five months for a response. (*Id.* at 70-72.)

On November 19, 2007, Schamp issued Wildi her yearly executive bonus check. (Wildi Dep. at 74.) Schamp told Wildi that Lasky was looking into her salary review, and Lasky had spoken to Keith Smith ("Smith"), who was the CEO for the West Penn Allegheny System. (*Id.*) Schamp alerted Wildi that she would receive a response within two to three weeks. (*Id.*)

After the series of meetings with Schamp, Wildi alleges that her relationship with Schamp deteriorated. Wildi noted that, at a September 17, 2007 meeting, Schamp became angry with Wildi concerning the salary review and advised Wildi to not have a similar conversation with other CEOs. (*Id*. at 77.) Wildi attempted to maintain a strictly professional relationship with Schamp, rather than attempting to also forge a personal relationship. (*Id*. at 79.) Wildi felt that Schamp began to treat her differently and Wildi consistently felt left out of senior team meetings. (*Id.*) Wildi felt left out because Schamp would sometimes include Harlovic, Sandora, and Englert in meetings, without including Wildi. (*Id.*) For example, for financial review meetings, Schamp testified that Harlovic and Sandora regularly attended along with herself; Kambhampati would occasionally attend. (Schamp Dep. at 115.) Others from within defendant's organization were routinely invited. (*Id.* at 118.)

**Vice-President Positions**

In 2004, when the vice-president title was created, Harlovic, Sandora, Englert and Wildi started at the same base salary of $103,001.60. (DSMF ¶ 7.) According to Wildi, all four vice-presidents had similar duties and responsibilities at the hospital. All the vice-presidents were responsible for ancillary departments and cost centers. (Wildi Dep. at 42-43.) All the vice-presidents maintained physician relationships and sat on the senior management team of Alle-Kiski. (*Id.*) Within the organizational structure Alle-Kiski had adopted during the relevant time period, there were four "pillars of success." Wildi alleges that each vice-president was in charge

of one pillar; her pillar of success was service. (*Id.*) Finally, prior to the reorganization in 2003,

the vice-presidents were previously directors of their respective operations. When they became

vice-presidents, the scope of their responsibilities grew to encompass more duties. (*Id.*)

Defendant, however, rejects plaintiff's assertion that the vice-president positions were

similar. Defendant relied upon a number of job requirement sheets as evidence of the differences

in the position requirements.  (*See* Davis Aff. (Doc. No. 21).)  Wildi, however, alleges that

defendant created "job requirement sheets" after she was fired, since she never saw them during

her tenure with defendant. (Wildi Dep. at 78.) The job requirement sheets are copyrighted 2008.

(*See, e.g.*, Davis Aff., Ex. A.)

**Harlovic's Position**

Davis stated that the role of vice-president of patient care services required a master's

degree in nursing, healthcare administration, business administration, or a clinical/medical

degree.  (Davis Aff., Ex. A.) He further stated that the job required ten years experience in the

administration of clinical support services in a hospital and a license as a professional nurse, and

required knowledge of the Joint Commission on the Accreditation of HealthCare Organizations

("JCAHO") standards and Pennsylvania Department of Health regulations.  (*Id.*) Harlovic was

the vice-president of patient care services during the time period at issue, and made the most

money of all the vice-presidents when considering both salary and executive bonuses. With

respect to Harlovic's position, Schamp testified that:

> The skill set required for [the vice-president of patient care
> services] – under the policies of the Department of Health, which
> govern the hospital, and Joint Commission, which sort of makes
> sure Medicare can pay us, hospitals are heavily regulated.  We're
> required to have a head of nursing.
>
> In my case, I use [sic] patient care executive to reflect an
> individual who is broadly trained and has a master's degree in

nursing and is able to clinically oversee those departments, has the background and educational preparation in – with a master's degree to be able to provide that and is a registered nurse and has to maintain their licensing and that type of thing.

. . . .

So the State, when they oversee our psychiatric units, require those units to report up to a master's prepared nurse, and so Michael [Harlovic] can provide that because we don't have directors that have that preparation.  So he fits two pieces of the regulations that were required to have that skill set.

. . . .

Well, the other skill set is a – it really comes with clinical preparation of oversight of our ability to affect core measures, things like surgical site infections, congestive heart failure, those types of initiatives as an institution, to manage those; as well as oversee our school of nursing.

We have a school of nursing.  I referenced earlier growing that school.  Mr. Harlovic has a history with academic programs.  He actually sits on the advisory board for the Butler School of Nursing, and then he provides the leadership direction up through the school of nursing and then on to me, but – as the direct contact of the growth of the school.  So those would be some inherent skill sets that he has.

(Schamp Dep. at 168-69.)  Schamp testified:

Mr. Harlovic's role and his responsibility was also to be, if you will, second in command.  Whenever I was on vacation or gone from the institution, with only one exception that I can think of in the five years that I was there, Michael Harlovic would step in to sign locum tenens agreements for doctors, interim privileges for the medical staff.  Someone needs to sign off on those administratively.  He would manage any of the regulatory issues, people who would show up, inspectors, complaints, formal issues.  He was accountable in my absence.  He would act as that individual.

(*Id.* at 170.) The one exception Schamp mentioned was when both Harlovic and Schamp were on

vacation at the same time; Sandora assumed those responsibilities on that occasion.  (*Id.*)

In contrast to defendant's evidence, Wildi affirmed that "I performed all the duties listed under the 'Job Responsibilities' section of the job description of Vice President Patient Care Services." (App'x to Pl.'s Br. in Opp. To Mot. for Summ. J., Ex. 7 ("Wildi Aff.") ¶ 6.) "In addition, although the 'Job Summary' section of the job description states that the Vice President Patient Care Services is responsible for outpatient services, respiratory therapy, and service excellence, I was actually responsible for those areas during my tenure at AKMC." (*Id.* ¶ 11.) Wildi also stated that "Harlovic did not engage directly in patient care. In fact, the employees who reported to him did not perform patient care either. *It was only the employees two levels down in the chain of command that actually performed patient care duties that would require a nursing degree*." (*Id.* ¶ 12 (emphasis added).) With respect to the chain of command, Wildi stated:

> Harlovic did not act as "second in command" until about 2 and ½ years into Cindy Schamp's tenure as CEO. Then, he acted as second in command only when Schamp was on vacation. However, if one of the other Vice-Presidents was scheduled to be "Administrator on Call" that week, we acted as the person in charge of the hospital in Schamp's absence.

(*Id.* ¶ 13.)

**Sandora's Position**

Davis testified that the role of vice-president of business operations or chief financial officer required a bachelor of arts or bachelor of science in accounting and a certified public accountant ("CPA") license. (Davis Aff. Ex. B.) Sandora held this position, and consistently made the most money behind Harlovic. Schamp testified that, with respect to the skills and responsibilities for the position of vice-president of business operations and director of finance, the position:

> requires an individual broadly trained and educated in finance and
> accounting with preparation and understanding of cost accounting;
> of Medicare payment systems; of reimbursement methodology; of
> the complex rules and regulations that govern how hospitals bill
> and receive payments; how we created charge masters, the systems
> that we use to create what the whole universe hates as – how
> hospitals charge; and is responsible to manage transfer of funds;
> oversight of our – all of our accounts; the issues related to benefits
> and pension; and prepare hospital accounting statements, such as
> we looked at earlier related to our monthly reviews; and is very
> skilled in accrual-based accounting, which in unique to hospitals.

(Schamp Dep. at 172.)  Schamp stated that Wildi could not assume the responsibilities of

Sandora, because:

> She had no preparation, that financial skill set; was unfamiliar with
> cost accounting; Medicare methodologies.  That individual would
> have been assigned from corporate finance to try to cover that gap,
> because you were accountable to manage those funds from a
> stewardship of those resources and legally protect the asset of the
> institution with individuals trained to do that.  That was not
> [Wildi]'s preparation and/or training.

(*Id.* at 173.)  Schamp testified:

> So George [Sandora] prepares the P&L statements, the activities,
> the balance sheet, the statement of account, all of those kinds of
> things for the board from a finance perspective.  He is responsible
> to do it, not someone in a department that reports to him.  It's very
> different than food service, which has a manager that's accountable
> for all that that just meets with him on a monthly basis to give him
> updates.

(*Id.* at 201.)  Schamp testified that Sandora's position had two functions: business operations,

and directing finance.  (*Id.* at 204.)

On Sandora's resume, it says that, as vice-president of business operations/director of

finance, he:

> Reports in matrix environment to the Chief Executive Officer of
> the Alle – Kiski Medical Center and the Vice President of Finance
> of the West Penn Allegheny Health System.  Responsibilities
> include oversight of financial statement preparation and reporting,

> budgeting, strategic financial planning, contract and program
> evaluations, and revenue cycle management.  Direct responsibility
> areas also include medical records, patient access and scheduling,
> nutrition services, environmental services, and patient transport
> services with dotted line responsibility in information systems and
> patient accounting areas.  Accomplishments include bottom line
> improvement from negative total margins exceeding four percent
> in each of the past three years, implementation of the clinical
> documentation management program, formation of the AKMC
> Trust for perpetual fundraising capabilities, and implementation of
> several revenue cycle improvement initiatives.

(Davis Aff., Ex. D.)

Although Schamp believed Wildi did not have the ability to perform the duties that Sandora performed, Wildi presented evidence claiming that she had the background to do so, and did indeed perform duties very similar to those of Sandora.  Wildi stated that:  "I also performed many of the duties listed under the job description for Chief Financial Officer, a title which George Sandora never held while I was employed by AKMC.  I also have a background in finance in that I took healthcare finance courses in my graduate program."  (Wildi Aff. ¶ 15.) Wildi additionally stated that "[i]n collaboration with George Sandora, I was responsible for preparing business plans for all capital projects within my assigned departments. Because I had responsibility for many capital intensive departments, I prepared many financial business plans." (*Id.* ¶ 16.)

**Englert's Position**

Davis declared that Englert's position as vice-president of business operations and business development included principal responsibilities "in the area of business development with respect to the hospital's comprehensive market and service line strategies, physician recruitment, relations and employment practices, and collaborative market relations with community services such as nursing homes."  (Davis Aff., ¶ 8.)  Schamp testified:

11

> The vice president for business – operations and business development . . . [required] solid preparation in business and an ability to create strategy, work closely with physicians, work very closely with the community on creation of strategic development opportunities, to grow business for the institution. There was an oversight of internal departments, and then there was a very large focus of that job external to the organization to grow, nurture relationships, understand physician practices.
>
> In particular, we grew a number of primary care practices and/or employed primary care physicians through our health system arm called AMPN, Allegheny Medical Practice Network. And Bill [Englert] was very involved in the negotiations, nurturing those relationships with those physicians to get them to contract with the institution and/or stabilize and maintain their relationship, because we were pretty far from the city relative to AMPN. So he really acted as sort of the conduit to manage that dynamic.

(Schamp Dep. at 174.)  Schamp testified that skills between the vice-president positions held by

Wildi and Englert were different in several ways:

> There was a substantial amount of knowledge-base and awareness of physician practice management and how physician offices run and are operated organizationally, which was very different than the position [Wildi] held in operations within the hospital. Physician practices are a very different beast.
>
> . . . .
>
> [Wildi] had no background of effectively running physician practices or understanding the nature of those, most recently seen in Joslin, which is our diabetic center, which has a physician component, a struggling part of the institution. It runs more like a physician practice than a department. Bill [Englert] has an understanding and awareness of those. And to be able to grow our volumes, which was why our financials were where they were, we needed someone who could grow those physician components and keep those on track and maintain those relationships, as opposed to start from scratch learning that piece effectively.

(*Id.* at 175-76.)  Schamp testified that Englert's position had two functions: operations, and

business development.  (*Id.* at 204.)

On Englert's resume, it states "Coordination of all activities related to marketing and outreach services including PriorityCare (Affinity Program for senior citizens), Communications and Marketing, Community Outreach, Speakers' Bureau, Destination Wellness (Health Resource and Education Center in the Pittsburgh Mills Mall), Physician Liaison and Business Development Team."  (Davis Aff., Ex. G.)  Englert's resume states he was a "Liaison with System-wide services related to:" "Physician Recruitment," "Growing Initiatives," and "Strategic Planning."  (*Id.*)  The resume also states Englert "Served as AKMC representative for various system-wide initiatives such as:" "Project BEST in 1999 – an initiative that identified and implemented cost reduction strategies totaling $52 million," and "SMART Project 2003 - the development and implementation of system-wide revenue cycle enhancement initiatives." (*Id.*)

Wildi disputes Schamp's testimony that Englert was responsible for physician practices:

> Englert was not responsible for managing physician practices. AKMC and West Penn Allegheny Health Systems have staff assigned to the management of physician office practices.  This is handled through the Allegheny Medical Practice Network and Allegheny Specialty Practice Network.  Moreover, I am qualified to and would be comfortable with managing physician practices.

(Wildi Aff. ¶ 23.)  Wildi also stated that "In my role as Vice President of Operations, I was directly involved in physician recruitment, physician relations, identifying opportunities for service line development, and collaborating with community services, such as Chambers of Commerce, Rotary, American society."  (*Id.* ¶ 21.)

**Wildi's Position**

According to Wildi, her responsibilities as vice-president of operations included administrative responsibility of several ancillary departments, physician liaison work, medical directorship contracts, and service excellence champion for Alle-Kiski and the West Penn Allegheny Health System. (Wildi Dep. at 33-35.) Wildi testified:

13

> I had administrative responsibility for various departments,
> ancillary departments, within the organization.  I had responsibility
> for some physician relations work, physician liaison work, things
> like that.   I managed medical directorship contracts for the
> organization.  I served as the service excellence champion not only
> for Alle-Kiski Medical Center, but also for the West Penn
> Allegheny Health System.  I represented the organization at that
> level, and, as it evolved, throughout the four years, the scope,
> obviously, grew as the programs continued to grow, as new
> technology was introduced into the organization.  I assumed more
> responsibility there for upgrading technology, upgrading facilities,
> programs, et cetera.  I took additional ancillary departments that I,
> initially, was not responsible for, so the scope continued to grow
> throughout that period of time.

(Wildi Dep. at 34-35.)  Wildi's ancillary departments included: laboratory, medical imaging,

cardiovascular services, special services, oncology, Citizens Ambulatory Care Center,

rehabilitation services, and service excellence. (App'x to Pl.'s Br. in Opp. To Mot. for Summ. J.,

Ex. 6.)  She testified that she had off-site responsibilities:

> I managed the Citizens Ambulatory Care Center which was the
> former Citizens General Hospital.   I was responsible for that
> campus.  I managed our off-site rehabilitation service providing
> OT and PT.  I managed our outpatient lab draw stations that were
> located throughout the community, and I managed our outreach,
> and that was entitled Pro Lab Laboratory Service.

(*Id.*)  Wildi stated her job required business development, including "[c]reation of new programs

and services to generate revenue for the organization and physician recruitment."  (*Id.* at 60.)

On Wildi's resume, it lists under "Duties and Responsibilities":

> Primary focus was to ensure that the highest quality service
> was obtained by the organization; developed a combined approach
> that successfully defined clear operational goals and objectives,
> introduced and maintained efficient processes as well ensured on-
> time deliverables and exceptional customer service.
> Directed the organization's major revenue-producing
> departments, including Medical Imaging, Cardiology and Vascular
> Services, Laboratory, Neurodiagnostics, Respiratory Medicine and
> Pulmonary Medicine.

14

Oversaw operations for the Joslin Diabetes Center serving over 300 patients annually as well as the Citizens Ambulatory Care Center, which introduced MRI services in the immediate area.

Responsible for regulatory and accreditation departmental compliance, including JCAHO, Department of Health, Nuclear Regulatory Commission and Department of Environmental Protection.

Negotiated hospital-based physician employment contracts in Radiology, Laboratory and Physiatry.

Served as committee member for Medical and Quality Affairs, Strategic Planning, Cancer Care, Organizational Performance Improvement and Radiation Safety.

Introduced shadowing, bottom-up recommendations and process improvement to ensure achievement of organizational goals.

(Def's Mot. for Summ. J., Ex. A.)  Under the heading "Accomplishments: Expansion," plaintiff's

resume states:

Introduced the Joslin Diabetes Center in response to the increasing need in the demographic area; negotiated contract to become a Joslin sub-affiliate; directed building and planning logistics prior to launch; actively recruited an endocrinology group to staff the facility.

Expanded outpatient Medical and Radiation Oncology services by partnering with specialty physicians within the hospital system; generated increasing volume and revenue, with a 12-15% first year increase.

Provided operational data to successfully negotiate a contract extension for the Citizens Ambulatory Care Center facility to ensure the continuation of healthcare services to Westmoreland County residents.

Redesigned the Joint Replacement Program to include pre-surgical consultation and education on exercise and adaptability training to achieve better clinical outcomes.

Introduced new location for MRI services, increasing hospital market penetration from 16% to 30%; served as project manager and oversaw all aspects of this $1.8 million expansion project.

(*Id.*)  Under the heading "Accomplishments: Cost Savings," plaintiff's resume states:

Achieved $1 million in annual savings by upgrading the Medical Imaging department from a traditional film-based model to a PACS environment; served as project manager for this $2.2 million upgrade.

Realized annual cost savings of $500,000 and system-wide equipment standardization by successfully reinstrumenting clinical within the Laboratory to include Chemistry, Hematology, Immunology and Microbiology.

Restructured Laboratory and Medical Imaging departments to improve operational efficiency, expand capabilities and reduce turnover by providing opportunities for staff growth.

Initiatives reduced no-show rate in Rehabilitation department by 20% as well as reduced patient wait times and significantly increased patient satisfaction scores.

(*Id.*)  Under the heading "Accomplishments: Patent Satisfaction," plaintiff's resume states:

Launched a cultural transformation that led to the first "Excellence Makeover" to optimize orthopedic patient care; success required extensive staff training and education.

Created and oversaw organizational and departmental goals through the development of a "Four-Pillar Model" based on the balanced scorecard; this cascading goal concept equally coordinated financial, service, quality and growth goals through a visual model to drive organizational outcomes and success.

Implemented elements of the Toyota Production Model allowing frontline workers to 'pull the cord' to stop any observed problems and to identify the necessary resources to change the course immediately.

As Senior Service Excellence Champion, directed all activities relating to in- and outpatient satisfaction by analyzing data and developing and implementing corrective recommendations arising from the Press Ganey monitoring tool; also served as liaison for training of staff.

(*Id.*)

Schamp admitted Wildi and Englert had very similar positions.  (Schamp Dep. at 149.)

The responsibilities, however, were not identical in Schamp's opinion:

Much of the work that Mr. Englert does and Bill did at that particular time for me, in particular, was around strategic

16

> development and physician services, the growth of that; the
> development of our retail strategy, which was Destination
> Wellness; and the work associated with many programmatic and
> project types of work that were in Bill's head. He had a lot more
> of – things that he – he had the intellectual capital in his brain, if
> you will, to lift those projects.
>
> Lorri had a large number of directors that she oversaw that
> were solid directors in each of those jobs that could functionally
> report to other people. Bill's position – there were a number of
> initiatives with nursing homes, with physician practices, with
> congruent housing projects. Many of those initiatives that were
> part of the work that Bill was attempting to lift through his direct
> work with those individuals were critical to filling our beds and
> growing volume . . . .

(*Id.* at 150.) Schamp testified: "I believe I referenced that as part of the things that Bill had the –

did not have departmental directors; he had a lot of things that he was personally charged with

doing, including the work with the nursing homes, the work with the doctors and the emergency

department lift." (*Id.* at 156.)

Although Schamp testified that Englert had different responsibilities with respect to

physicians than Wildi, Wildi, as already noted, refuted that Englert managed physician practices.

(Wildi Aff. ¶ 23.) Schamp testified that each of the four vice-presidents maintained physician

relationships and were responsible for administrative oversight within the defined cost centers

that they were assigned. (Schamp Dep. at 192-94.) Each of the four attended monthly board of

trustees meetings and senior team leadership meetings. (*Id.* at 194.)

Wildi testified at her deposition that her job responsibilities were similar to those of

Harlovic and Sandora. Plaintiff stated that her additional tasks included ensuring compliance

with hospital policies, hospital procedures, and state and federal regulations. Wildi was also

required to meet the JCAHO standards. (Wildi Dep. at 41-44.) Plaintiff asserted she had a

background in finance because she had taken healthcare finance courses at the graduate level,

and she performed certain financial tasks for defendant.  (Wildi Aff. ¶ 15.)  Wildi stated:

> My job was similar to Harlovic, Englert, and Sandora in that all
> four of us: were members of the Senior Executive Team; carried
> the title of Vice President; had departments and services for which
> we were responsible; managed finances within our respective
> areas; shared in the organization's success and failures equally;
> attended Board of Director Meetings; participated in system-wide
> (WPAHS) initiatives; had responsibility for medical staff relations;
> participated in assigned committees of the Board of Directors;
> were required to serve as AKMC ambassadors to the community;
> and served as "Administrators on Call" on a rotating basis 7 days a
> week, 24 hours a day.

(*Id.* ¶ 4.)

**Wildi's Termination from Alle-Kiski**

In 2007, there were concerns over the financial condition of Alle-Kiski. (DSMF ¶ 10.)

Wildi recalled that defendant's financial condition was poor during the 2007 calendar year: "we

were behind budget in volume and in revenues, total revenue, was behind budget as was

volume."  (Wildi Dep. at 80.) At the end of 2007, there was speculation that several positions

would be eliminated. (*Id.* at 81.)  In December 2007, the senior team met to establish initiatives

for cutting costs hoping to generate larger revenue; the executives passed around a draft listing of

various positions to be eliminated. (*Id.*) In a January 2, 2008 meeting, Schamp presented to the

senior team a final list of positions that would be eliminated; it included the same positions as

those on the draft list. (*Id.* at 81-82). The listed employees were to be eliminated on January 9,

2008; the four people were fired on that day. (*Id.*) Wildi was surprised that four employees were

fired, believing that the elimination of these positions was not drastic enough to alleviate

defendant's financial concerns and other measures would have had a more significant impact.

(*Id.* at 83-85.)  For this reason, she thought that the four employees were not eliminated for

financial reasons.  (*Id.* at 83-84.) Later that day, Wildi herself was fired from Alle-Kiski. Schamp

notified Wildi that her termination was solely based upon financial considerations and was not

performance-based. (DSMF ¶¶ 10-11).  Plaintiff testified that "probably hundreds" of

defendant's employees told her that she was terminated for reasons other than financial reasons.

(Wildi Dep. at 101-07.)  No official member of the senior management team, however, told

plaintiff that she was eliminated for reasons besides financial reasons.  Plaintiff stated that Nancy

Giulioth ("Giulioth"), executive director of a trust and an "ad hoc member" of the team, said the

termination "was terrible . . . , it made no sense, and it didn't need to happen." (*Id.* at 101-02.)

There is no evidence, however, that Giulioth played any role in the decision to terminate

plaintiff's position.

Schamp determined in mid-November 2007 that Wildi's position was to be eliminated;

notes from a November 21, 2007 financial review meeting indicate that this decision had earlier

been made.  (Schamp Dep. at 106, 116.)  The decision was likely made sometime between

November 10 and November 21, 2007.  (*Id.* at 211.)  The decision to eliminate a vice-president

position came down to either Wildi's position or Englert's position; Wildi testified that Schamp

told her:

> well, it came down to you or Bill Englert.  And I chose to keep Bill
> Englert.  And I said, well, why Bill?  And she said because we've
> got a big capital ED project to lift, and Bill is the one to lift that.  I
> then proceeded to tell her that I did not agree with this decision.
> That, I had more seniority on the senior team than anybody.  I had
> as much responsibility and scope and span of control as anybody
> there.   That, I had far more experience in the capital project
> environment because probably – I recited ten or 12 capital projects
> that I administratively was responsible for over the five years that
> Cindy had been there.  And I asked her to give me an example of a
> capital project that Bill had lifted and she couldn't.

(Wildi Dep. at 88.)  Capital ED was a capital expansion project of the emergency department at Alle-Kiski.  (*Id.* at 119.)  The hospital broke ground on the emergency department program in November 2007.  Schamp testified "We had a capital campaign going on.  We broke ground on [the emergency department] project in 2007."  (Schamp Dep. at 46.)  Although the project officially began in 2007, little progress was made.  (Wildi Dep. at 119.)  Defendant eventually hired a new employee to manage the capital ED project; that man was not Englert.  (*Id.*)

After Wildi's vice-president position was eliminated, her responsibilities were allocated among the other vice-presidents and Khambhampati. (Schamp Dep. at 142.)  Englert assumed responsibility for Citizens Ambulatory Care Center, medical imaging, and special services.  (*Id.*)  Harlovic assumed responsibility for cardiovascular services and rehabilitation services.  (*Id.*)  Davis assumed responsibility for service excellence.  (*Id.* at 142-43.)  Khambhampati assumed responsibility for laboratory and oncology.  (*Id.* at 143.)  Sandora assumed responsibility for food services and environmental services.  (*Id.*) Schamp gave Wildi a severance of six months, in exchange for Wildi signing a covenant not to compete. (Wildi Dep. at 120-24.)

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S.242, 247-48 (1986). In determining whether the dispute is genuine,

the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Se. Pa. Transp. Auth*., 479 F.3d 232, 238 (3d Cir. 2007)("In considering the evidence, the court shall draw all reasonable inferences against the nonmoving party.") The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable fact finder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.*

The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993)(citing 10A CHARLES ALLAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); *Pollack v. City of Newark*, 147 F.Supp.35, 39 (D.N.J. 1956), *aff'd*, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

### Discussion

Wildi's complaint contains two counts. In count I, plaintiff alleges that defendant violated the Equal Pay Act. Plaintiff asserts that she was paid less than all her male counterparts, who served in vice-president roles similar to hers. In count II, plaintiff alleges that defendant retaliated against her in violation of 29 U.S.C. § 215(a)(3), when defendant discharged plaintiff

after she made several complaints regarding her salary to former CEO Schamp. Alle-Kiski

moved for summary judgment with respect to both counts contained in the complaint.

**(A) Equal Pay Act**

    **(1) Burden-Shifting Framework**

In count I, plaintiff claims that defendant violated the Equal Pay Act because it paid

plaintiff a lower salary than all of her male counterparts. The Equal Pay Act states, in relevant

part:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).  Plaintiff alleges that she was paid less than male vice-presidents, even

though she was a vice-president.

An Equal Pay Act case requires shifting burdens. *EEOC v. Del. Dep't of Health & Soc.

Servs.*, 865 F.2d 1408, 1413 (3d Cir. 1989). To establish a prima facie case under the Equal Pay

Act, a plaintiff must show that defendant paid different wages to employees of the opposite sex

for equal work on jobs which required equal skill, effort, and responsibility, and all of which are

performed under similar working conditions. *Dubowsky v. Stern*, 922 F. Supp. 985, 990 (D.N.J.

1996.) Wildi must show that she was paid unequally for "substantially equal" work. *Del.Dep't of Health*, 865 F.2d at 1413.

If a plaintiff is able to make a prima facie case, the burden shifts to the defendant. The defendant can raise one of the four affirmative defenses stated in the Equal Pay Act. The four affirmative defenses include three that are "specific and one general catchall." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). A difference in payment between opposite sexes is permissible if it is made pursuant to: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a system based upon any other factor other than sex (the "catchall defense"). *Id.* at 196-97. An employer cannot prevail at the summary judgment stage based upon an affirmative defense unless it can prove the existence of the affirmative defense "so clearly that no rational jury could have found to the contrary." *Del. Dep't of Health*, 865 F.2d at 1414. Under the Equal Pay Act, plaintiff does not need to prove that an employer intended to discriminate. A showing of intent, however, may be used to establish that an employer's affirmative defense is a pretext for discrimination. *Del. Dep't of Health*, 865 F.2d at 1414.

### (2) Prima Facie Case

In order to establish a prima facie case, Wildi must show that she was paid less than males for performing work of substantially equal skill, effort, and responsibility, under similar working conditions. *Dubowsky*, 922 F. Supp. at 990. It is well settled that the jobs do not need to be identical in every respect. *See Corning Glass Works*, 417 U.S. at 204. Equal means substantially equal and "[a]ny other interpretation would destroy the remedial purposes of the Act." S*hultz v. Wheaton Glass Co*., 421 F.2d 259, 265 (3d Cir. 1970). This standard does not provide an employer with a justification for paying employees of one sex less than employees of

23

the opposite sex because of inconsequential or trivial differences in their respective duties.

*Usery v. Allegheny County Inst. Dist.*, 544 F.2d 148, 152-53 (3d Cir. 1976).  The critical question

with respect to the issue of "equal work" is whether the jobs being compared have a "common

core" of identical (or substantially similar) tasks.  *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148,

156 (3d Cir. 1985).  If this question yields a positive answer, the inquiry turns to whether

"additional tasks" required by either of the jobs make the work performed by the different

employees filling those jobs "substantially different."  *Id.*

In determining whether jobs require equal skill, equal effort, or equal responsibility, the

court must conduct separate analyses. 29 C.F.R. § 1620.14(a).

> This inquiry is informed by the [Equal Pay Act]'s implementing
> regulations, which provide that "[s]kill includes consideration of
> such factors as experience, training, education, and ability," 29
> C.F.R. § 1620.15(a); "[e]ffort is concerned with the measurement
> of the physical or mental exertion needed for the performance of a
> job," 29 C.F.R. § 1620.16(a); and "[r]esponsibility is concerned
> with the degree of accountability required in the performance of
> the job, with emphasis on the importance of the job obligation," 29
> C.F.R. § 1620.17(a).

*Drury v. Waterfront Media, Inc.*, No. 05 Civ. 10646, 2007 WL 737486, at *3 (S.D.N.Y. Mar. 8,

2007).  In considering whether the positions require equal skill:

> It must be measured in terms of the performance requirements of
> the job. If an employee must have essentially the same skill in
> order to perform either of two jobs, the jobs will qualify under the
> [Equal Pay Act] as jobs the performance of which requires equal
> skill, even though the employee in one of the jobs may not exercise
> the required skill as frequently or during as much of his or her
> working time as the employee in the other job. Possession of a skill
> not needed to meet the requirements of the job cannot be
> considered in making a determination regarding equality of skill.

29 C.F.R. § 1620.15(a).

Wildi argues that all four of the vice-presidents' positions were substantially equal, because each shared the same title of vice-president. The common title, however, is not determinative evidence that the positions were substantially equal. *See* 29 C.F.R. § 1620.13(e); *Fayson v. Kaleida Health, Inc.*, No. 00-CV-0860E(SR), 2002 WL 31194559, at *9 (W.D.N.Y. Sept. 18, 2002). In addition, plaintiff argues that the roles of the vice-presidents were equal, because in 2004, when the vice-president positions were created, all four employees started at the same base salary of $103,001.60.  Wildi alleges that all four vice-presidents had similar core duties and responsibilities at the hospital. Each vice-president oversaw an ancillary department. Each maintained physician relationships and sat on the senior management team of Alle-Kiski. Within the organizational structure Alle-Kiski adopted, there were four "pillars of success." Each vice-president was in charge of one pillar, and Wildi's pillar was service. Prior to the reorganization in 2003, each vice-president was previously a director of his or her respective operations.

Defendant counters by arguing that plaintiff cannot establish her prima facie case. Defendant contends that even though all four vice-presidents shared the same title, the core duties and skill levels needed for each position were different.  Defendant argues the role of vice-president of patient care services required a master's degree in nursing, healthcare administration, business administration, or a clinical or medical degree.  The position required ten years experience in the administration of clinical support services in a hospital and a license as a professional nurse. The job also required knowledge of the JCAHO accreditation standards and Pennsylvania Department of Health regulations. The role of vice-president of business operations or chief financial officer required a bachelor of arts or bachelor of science in

25

accounting and a CPA license.  Defendant argues that position required an accounting background and substantial experience in healthcare finance.

Defendant argues the responsibilities of the positions were different.  Defendant argues the vice-president of patient care services had clinical responsibilities that plaintiff did not perform, and the vice-president of business operations had financial and accounting duties for defendant's entire facility.  With respect to the vice-president of business operations and business development, defendant argues that this position was responsible for strategic development, physician services, retail strategy, and initiatives with nursing homes, physician practices, and housing projects, in addition to responsibilities related to operational duties.

For the same reasons that job titles are not determinative, job descriptions are not determinative.  The relevant inquiry focuses upon the content of the position.  "[W]hen a court assesses the substantial equality between jobs, it should rely on actual job performance and content rather than job descriptions."  *Heller v. Elizabeth Forward Sch. Dist.*, 182 F. App'x 91, 95 (3d Cir. 2006). The court therefore must analyze the evidence of the actual job duties performed. The court notes that Wildi argues that the job requirement sheets are post hoc fabrications, created by defendant after her position was already eliminated in an effort to invent differences between the positions that did not really exist when the positions were formed.  As evidence to support this, Wildi notes that the sheets are dated 2008, and this action was brought in 2008. Wildi questions the validity of the job requirement sheets that delineate the differences among the vice-president positions.

Focusing on actual job performance, plaintiff created a genuine issue of material fact that at least two of the other vice-presidents performed many duties like she performed.  In her affidavit, she avowed that each vice-president was a member of the senior executive team, each

managed finances within their assigned areas, each attended board of directors meetings, each participated in forming system-wide initiatives for the West-Penn Allegheny Health System, each was required to serve as an ambassador to the community, and each was required to serve as "Administrator on Call" on a rotating basis.  The shared title of vice-president and the same initial base salary, although neither is a persuasive piece of evidence if viewed in isolation, support the conclusion that the positions were of equal skill and equal responsibility.

With respect to the additional duties assigned to the other vice-presidents that go beyond the core duties, Wildi argues that, along with her job responsibilities listed on the organizational chart, she performed other duties akin to those of the other vice-presidents.  The court agrees that, when viewing the evidence in her favor, her position had similar requirements and responsibilities to Englert's position. Schamp admitted that the positions held by plaintiff and Englert had similar job qualifications. Schamp stated that the key difference between those two positions was Englert's responsibility for physician services; Wildi presented contradictory evidence that Englert was not responsible for managing physician practices.  Although a close call, the court finds that Wildi adduced sufficient evidence that a reasonable finder of fact could conclude that the similarities between her position and Englert's position were substantial enough to establish a prima facie claim under the Equal Pay Act. Even if the other vice-president positions could be viewed as different for purposes of the Equal Pay Act, plaintiff only needs one comparator to establish her claim, and the similarities of her position and Englert's position would suffice.  *See EEOC v. White & Son Enters.*, 881 F.2d 1006, 1009 (11th Cir. 1989) ("[The EEOC] need only show discrimination in pay against an employee vis-a-vis one employee of the opposite sex [to establish a violation of the Equal Pay Act].");  *Ames v. Verizon Data Services, Inc.*, No. 8:07-cv-00698-T-24-TGW, 2008 WL 3927262, at *2 (M.D. Fla. Aug. 21, 2008) ("To

establish a violation of the Equal Pay Act, Plaintiff must show pay discrimination between herself and at least one comparator of the opposite sex.").

Whether the similarities between Wildi's position and Harlovic's position were substantial enough to establish a prima facie case under the Equal Pay Act is an even closer call. Wildi adduced evidence of additional tasks that she performed, including ensuring compliance with hospital policies, procedures, JCAHO accreditation standards, and state and federal regulations. These additional tasks are comparable to those required of Harlovic's position that defendant argues plaintiff was not responsible for performing.  Wildi also adduced evidence that the nursing license was not necessary to perform the job duties.  As mentioned, the regulations explain that the possession of a skill that is not needed to accomplish the position's duties is not relevant in determining whether the positions were of equal skill.  *See* 29 C.F.R. § 1620.15.

With respect to Sandora's position, plaintiff asserts she had a background in finance, having taken healthcare finance courses at the graduate level.  She adduced evidence that she handled accounting responsibilities for certain projects and departments.  Sandora, however, had financial and accounting responsibilities for defendant's entire medical facility.  Plaintiff presented no evidence to refute this claim.  The evidence offered by plaintiff only establishes that she had financial responsibilities for her assigned areas.  Her financial responsibilities were much less substantial in terms of scope and complexity.  For this reason, plaintiff has not adduced sufficient evidence to establish that her position was substantially similar to Sandora's position.

In *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 683 (7th Cir. 1998), a female employee, who held the position of vice-president of an administrative division, learned that male vice-presidents were paid more than she was.  She brought claims under the Equal Pay Act

and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. *Id.* at 684. With

respect to her Equal Pay Act claim, the employee alleged:

> that she was a management-level officer of [the employer] – a
> division vice president and an executive. Indeed, she continues,
> although her substantive responsibilities were different from the
> other division vice presidents, she shared with them a common
> core of substantially similar tasks requiring substantially equal
> skill, effort and responsibility: [the employee], like the other
> division heads, was responsible for managing a division; she had
> the responsibility and authority to hire, fire, evaluate and supervise
> her employees; she was charged with managing the division
> budget. Indeed, [the employee] had the largest division in terms of
> the number of employees. Moreover, all division vice president
> positions were ranked equally under [the employer]'s Salary
> Administration Program.
>
> [The employee] further points out that, despite these core
> similarities between her responsibilities and those of the other vice
> presidents, and even though she was among the most senior
> employees in terms of tenure, she was paid significantly less than
> male vice presidents.

*Id.* at 685. The Court of Appeals for the Seventh Circuit, however, rejected the employee's

arguments, because she did not adduce sufficient evidence that the vice-president positions

required equal skill. *Id.* at 686. The court of appeals held:

> The record makes clear that [the employee]'s job was substantially
> different from the jobs performed by the other vice presidents.
> Most importantly, the other vice presidents primarily had
> responsibility for key aspects of [the employer]'s core substantive
> insurance policymaking. This was a responsibility that [the
> employee] admittedly did not have the skills to perform and had
> never performed. Therefore, despite her vice presidential rank, her
> role in the direction of the company was understandably more
> circumscribed.

*Id.*

This case is distinguishable from *Stopka*, at least with respect to the positions of Englert

and Harlovic. Here, there is evidence that Wildi's role in defendant's organization was similar to

that of two other vice-presidents. Most importantly, there is evidence that all the core

responsibilities performed by the vice-presidents were substantially equal, and, with respect to the additional duties of the two other vice-presidents, there are issues of fact whether Wildi had similar supplementary responsibilities. Wildi adduced evidence that at least two other male vice-presidents were tasked with individual goals in their departments, and also oversaw ancillary departments.  In *Stopka*, by contrast, there was no evidence that the plaintiff was responsible for tasks similar to those performed by the other vice-presidents.

In conclusion, the court determines that plaintiff adduced sufficient evidence to raise a genuine issue of material fact with respect to her prima facie case under the Equal Pay Act. Under the burden-shifting framework of the Equal Pay Act, the next step is to analyze whether defendant adduced sufficient evidence to prove an affirmative defense as a matter of law.

### (3) Affirmative Defenses

After a plaintiff establishes a prima facie case, the burden shifts to the defendant to raise one of four affirmative defenses.  The defendant must prove one of the four affirmative defenses "so clearly that no rational jury could have found to the contrary." *Del. Dep't of Health*, 865 F.2d at 1414. Here, defendant raised two affirmative defenses for the pay differential. Defendant asserts that the pay difference in bonuses was based upon merit and the salary differential was based upon market forces.  Plaintiff alleges that defendant violated the Equal Pay Act, because the vice-presidents' salaries diverged after their positions were established in 2004.  Even though the initial base salaries were identical, the salaries diverged in subsequent years.

### (a) Market-Based Defense

Defendant relies upon a market-based defense, a catchall defense, to establish that the salary disparity was not based upon Wildi's gender. A market-based defense is applicable where unequal wages reflect market conditions of supply and demand. Salary differentials based upon

such market conditions are not prohibited by the Equal Pay Act. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1322 (9th Cir. 2004). To determine whether the market-based defense applies, an employer "may consider the marketplace value of the *skills* of a particular individual when determining his or her salary." *Dubowsky*, 922 F. Supp. at 993. An employer must also rationally explain the use of market information. *Id.*

In this case, defendant strongly argues that all employees were paid the market value of their skills. In particular, defendant argues Harlovic and Sandora received higher compensation because of the small number of individuals who had the necessary skills and qualified for the positions they held. For these reasons, defendant argues that it rationally explains the use of the market defense.

Defendant must produce "sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." *Stanziale v. Jargowsky*, 200 F.3d 101, 108 (3d Cir. 2000). Plaintiff offered evidence raising factual issues with respect to the market-based defense, and thus a rational jury could find against defendant. Plaintiff argues that her job responsibilities were nearly identical to the other vice-presidents and her skill set was just as valuable as that of the other vice-presidents. In support of her contention, there is evidence Alle-Kiski paid an identical base salary to the vice-presidents for several years after the positions were first established. This is evidence that the market value of the skills of the individuals holding the positions were equal.  One of the concerns plaintiff raised in her initial complaint to Schamp was her concern that she and other employees were not paid the market value of their skills.  Plaintiff testified at her deposition that she discussed with Englert that they were not paid to market and were paid less than other vice-presidents in sister facilities, such as West Penn Hospital and Allegheny General Hospital.

Plaintiff raises enough facts so that a rational jury could find in her favor and reject defendant's market-based affirmative defense.

### (b) Merit-Based Defense

With respect to the executive bonuses, which also factored into overall salaries of the vice-presidents, defendant asserts a merit-based defense – the second affirmative defense in the Equal Pay Act. According to defendant, the bonuses were based upon the overall performance of the team in three separate areas: finance, quality, and patient care.  Each individual vice-president was responsible for a series of goals throughout the fiscal year; Schamp would evaluate which team members contributed most to the overall performance of the organization. Schamp would recommend a percentage of the salary to be distributed as bonuses. The bonuses changed based upon the fiscal strength of the hospital during that particular year.

The bonuses were a percentage of the base salary. Since 2007, the base salaries for the vice-presidents were different and, therefore, the subsequent bonuses reflected the salary disparity. Each employee was awarded a merit bonus based upon their individual work. Looking at the merit bonus, Englert had the highest merit percentage in 2007 followed by, in descending order, Sandora, Harlovic, and Wildi.  The "merit" portion of the bonuses changed to reflect those individuals who had most closely performed in accordance with their goals.  Schamp testified Englert received a higher merit bonus than Wildi because his job performance was better. Wildi struggled with core laboratory transition in 2007; yet, that one factor was not the sole benchmark for why Wildi earned a lower merit bonus. Schamp additionally considered feedback from other key employees and meetings with other departments. Since Schamp believed Wildi only experienced a slight setback, Wildi only suffered a slight merit decrease.

In Wildi's filings with the court, she did not separately address the salaries and the bonuses. In this instance, the merit-based defense may be a valid affirmative defense for the defendants with respect to the bonuses because plaintiff did not specifically argue that the bonuses were not based upon merit.  The bonuses, however, were in part tied to the vice-presidents' underlying salaries because the bonuses were awarded as a percentage of the base salaries.  As already explained, there are factual issues whether at least two of the other vice-presidents were paid the market value of their work.  Factual issues exist with respect to the bonuses, at least to this limited extent.

Assuming that plaintiff can establish a prima facie case, the burden on an employer is a strict one. To succeed on a summary judgment motion, a moving-party defendant must prove the existence of an affirmative defense so that there are no issues of fact related to the defense. In this instance, plaintiff adduced evidence sufficient to establish her prima facie case showing that the work she completed was substantially equal to at least two of her fellow vice-presidents. Plaintiff additionally raised issues of material fact with respect to whether defendant paid those vice-presidents the market value of their skills.

The Equal Pay Act prohibits even a small difference in pay between members of opposite sexes performing equal work. *Hodgson v. Am. Bank of Commerce*, 447 F.2d 416, 420 (5th Cir. 1971) ("Any wage differential between the sexes, no matter how small and insignificant, is sufficient under the statutory prohibition.").  Even excluding the bonuses, there are issues of material fact whether defendant violated the Equal Pay Act.  Those issues cannot be resolved upon defendant's motion for summary judgment.  Summary judgment must be denied with respect to the Equal Pay Act claim in count I.

**(B) Fair Labor Standards Act: Retaliation**

In count II, plaintiff alleges that she was retaliated against in violation of 29 U.S.C. § 215(a)(3) of the FLSA, which provides that it is unlawful for any person:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or cause to be instituted any proceeding under or related to [the FLSA], or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). The FLSA's antiretaliation provision is applicable to Equal Pay Act retaliation claims. *Marriot v. Audiovox Corp.*, No. 04-cv-1307, 2006 WL 3805145, at **8-9 (W.D . Pa. Dec. 22, 2006). "The appropriate framework for analyzing claims of unlawful retaliation under the FLSA is the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Cononie v. Allegheny Gen. Hosp.*, 29 F. App'x 94, 95 (3d Cir. 2002).

Similar to plaintiff's Equal Pay Act claim, plaintiff's retaliation claim is subject to a burden-shifting analysis. The employee must first establish three elements for a prima facie case: (1) the employee engaged in protected employee activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). If a plaintiff can prevail on his or her prima facie case, then the burden shifts to the employer to establish a legitimate, nonretaliatory reason for the adverse employment action. *Woodson*, 109 F.3d at 920 n.2. If the burden of production is met by the defendant, the ultimate burden of persuasion shifts back to the plaintiff to prove "that the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated

34

against the plaintiff." *Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

**(1) Prima Facie Case**

**(a) Protected Employee Activity**

An internal complaint is a protected activity for purposes of 29 U.S.C. § 215(a)(3). *Chennisi v. Communications Constr. Group, LLC*, No. Civ.A. 04-4826, 2005 WL 387594, at *2 (E.D. Pa. Feb. 17, 2005). "To determine if retaliation plaintiffs sufficiently 'opposed' discrimination, we look to the message being conveyed rather than the means of conveyance." *Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006) (internal quotation omitted). For the first element of Wildi's prima facie case, plaintiff only needs to establish that she was acting under a good faith reasonable belief that her employer was engaging in an unlawful employment practice. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996).

In *Vereen v. Woodland Hills School District*, No. CV-06-462, 2008 WL 794451, at *27 (W.D. Pa. Mar. 24, 2008), this court held that salary complaints to a boss were protected activity for an Equal Pay Act retaliation claim. Similarly, in *White & Son Enterprises*, the Court of Appeals for the Eleventh Circuit held that requests by female employees to receive pay increases similar to one received by a male employee were protected activities in satisfaction of the first element of an prima facie Equal Pay Act retaliation case. *White & Son Enter.*, 881 F.2d at 1007-08, 1011-12. It is undisputed from the record that Wildi spoke to Schamp on three separate occasions asking for a salary review. Wildi expressed to Schamp her belief that there was an unfair wage disparity, and Wildi testified at her deposition that she specifically complained that one of the problems with the disparity was that all her counterparts were male. Wildi, therefore,

adduced sufficient evidence that she protested an employment practice made unlawful by the Equal Pay Act. This satisfies the first element of her prima facie retaliation claim.

### (b) Materially Adverse Action

The second element of plaintiff's prima facie case requires her to establish that Alle-Kiski took a materially adverse action against her. A materially adverse action is any action taken by the employer that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation omitted). The materially adverse standard separates serious injuries from trivial harms. *Id.* at 67-68. The adverse action must dissuade "a *reasonable* employee or job applicant" from engaging in protected activity. *Id*. at 68. In *Burlington*, the court held that the reassignment of shifts to impose duties on an employee that were more arduous and dirty than her previous duties was a materially adverse action taken by her employer. *Id*. at 70-71. In this case, Wildi alleges she was terminated from her position as vice-president because of the prior complaints she made to Schamp. In *Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d. Cir. 2006), the Court of Appeals for the Third Circuit noted that retaliatory conduct rises to the level of a materially adverse action if the conduct alters the "employee's compensation, terms, conditions or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Id.* at 1301. Wildi was terminated from her position, which altered her compensation and affected her status as an employee. Termination from an executive position is materially adverse and a reasonable jury could conclude that termination would deter a reasonable worker from making charges of discrimination.

**(c) Causal connection between the adverse action and plaintiff's exercise of her FLSA rights**

The third and last requirement for a plaintiff to establish a prima facie case of retaliation is that a casual connection must exist between the adverse action and the plaintiff's protected activity. Defendant argues that Wildi's retaliation claim fails because she cannot demonstrate a causal connection between the adverse employment decision to terminate her employment and her protected activity of making salary complaints.

The United States Court of Appeals for the Third Circuit articulated two main factors that are relevant with respect to establishing a causal link to satisfy a prima facie case of retaliation: (1) timing or (2) evidence of ongoing antagonism. *Abramson v. William Patterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period"). As this court stated in *Sabbrese v. Lowe's Home Centers, Inc.,* 320 F. Supp. 2d 311 (W.D. Pa. 2004):

> The United States Court of Appeals for the Third Circuit is somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-921 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link."); *Jalil v. Avdel Corp.,* 873 F.2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); *but c.f. Quiroga v. Hasbro, Inc*., 934 F.3d 497 (3d Cir. 1991) (following bench trial, court determined "as a matter of fact" the timing of the plaintiff's discharge alone did not raise an inference of retaliation); *Krouse v. American Sterilizer Co*., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a

causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Timing, however, in conjunction with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280-81 (3d Cir. 2000). For example, timing combined with evidence of inconsistent reasons given by an employer for an employee's termination was held to satisfy the causation prong of the prima facie case. *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986). *See also Abramson*, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); *see also EEOC v. L.B. Foster Co.,* 123 F.3d 746, 753-54 (3d Cir. 1997), *cert. denied*, 522 U.S. 1147 (1998).

*Id.* at 323.

Plaintiff may rely on a "broad array of evidence" to establish a causal link between her complaints and the materially adverse action. *Marra,* 497 F.3d at 302. On its own, "an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, to establish the requisite causal connection." *Id.* (citing *Robinson,* 120 F.3d at 1302). In *Jalil*, the employee was terminated two days after filing an EEOC claim. Causation was inferred in this narrow time frame because it was unusually suggestive. *Jalil*, 873 F.2d at 708.

In Wildi's case, she made her last complaint to Schamp on November 19, 2007. On January 9, 2008, six weeks later, she was terminated. The degree of suggestiveness of the time span depends on the particular facts of the situation. *Emerick v. Norfolk Southern Ry. Co.,* No. CIVA 3:03-266, 2006 WL 3692595, at *13 (W.D. Pa. Dec. 12, 2006). In Wildi's case, she had her last discussion with Schamp relevant to her complaint on November 19, 2007. Although plaintiff was not terminated until January 9, 2008, the decision to terminate plaintiff was made in mid-November. Defendant could not specify the exact date on which the decision was made, but

Schamp believed that the decision was made some time between November 10 and November 21, 2007. It is possible that the decision was made on either November 20 or November 21, 2007. Viewing the evidence in favor of plaintiff, a reasonable finder of fact could conclude that decision was made within two days of plaintiff's November 19, 2007 complaint. The court also notes that plaintiff's first complaint was raised on April 26, 2007, and she followed-up on the matter on July 2 and September 17, 2007. Even if the decision to terminate plaintiff's employment was made prior to her November 19, 2007 complaint, that decision was within two months of her previous complaint. Based upon this short time span, a reasonable fact-finder could determine that there was a causal link between the protected activity and adverse action. *See Fasold v. Justice*, 409 F.3d 178, 189-90 (3d Cir. 2005) (holding than a time span of "less than three months" is temporally proximate and "an inference of retaliation can be drawn"); *Nesselrotte v. Allegheny Energy, Inc.*, No. 06-01390, 2009 WL 703395, at *13 (W.D. Pa. Mar. 16, 2009) ("Defendants admit that [they] first contemplated suing [plaintiff's husband's company] in October 2004, less than three months after Plaintiff initially complained about [age discrimination], and less than two months after she participated in an investigation into [discriminatory] conduct. . . . The short time period between Plaintiff's protected activity and the time during which it first contemplated suing [plaintiff's husband's company] is evidence of a causal connection."). While it is a close call, the court concludes plaintiff adduced evidence of a causal connection between her termination and her protected activity sufficient to withstand a motion for summary judgment.

### (2) Legitimate Business Reason

Under step two of the *McDonnell Douglas* framework, where the plaintiff establishes a prima facie case of discrimination, a presumption arises that the employer unlawfully

discriminated against the employee, shifting the burden of production to the defendant to

"articulate some legitimate, nondiscriminatory reason for the employee's rejection."  *McDonnell*

*Douglas*, 411 U.S. at 802; *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).  A defendant

is not required to meet this burden by a preponderance of the evidence, but rather:

> the employee's prima facie case of discrimination will be rebutted
> if the employer articulates lawful reasons for the action; that is, to
> satisfy this intermediate burden, the employer need only produce
> admissible evidence which would allow the trier of fact rationally
> to conclude that the employment decision had not been motivated
> by discriminatory animus.

*Burdine*, 450 U.S. at 257.  "[A]lthough the *McDonnell Douglas* presumption shifts the burden of

production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the

plaintiff.'"  *St. Mary's Honor Ctr*., 509 U.S. at 507 (citing *McDonnell Douglas,* 450 U.S. at 253).

Defendant articulated a legitimate and nonretaliatory reason for Wildi's termination,

stating that her position was eliminated for strictly financial reasons. In December 2007, a

financial meeting was held in which discussions took place regarding how the hospital was

losing revenue.  The individuals in attendance discussed alternatives to improve the financial

track record of the organization. Wildi admitted that in late 2007 the hospital was behind in

revenue, volume, and budgets.  Throughout the period between October 2007 and January 2008,

the senior team candidly discussed ways to change the financial situation of the hospital. One of

the ways to increase revenue costs was to eliminate some positions within the hospital. Wildi

participated in the discussions with respect to the elimination of various positions, although she

did not participate in the discussions to eliminate her position.  She was aware that firings were

occurring at Alle-Kiski as a result of financial difficulty. Accordingly, defendant set forth a

legitimate and nonretaliatory reason for terminating Wildi; the burden shifts back to plaintiff.

### (3) Pretext

The final issue that the court must address with respect to summary judgment in this case

is the last part of the *McDonnell Douglas* framework: whether plaintiff can demonstrate that

defendant's stated reason for her termination was a pretext for gender discrimination.  The

United States Court of Appeals for the Third Circuit developed a two-prong test (the "*Fuentes*

test") for analyzing whether a plaintiff has presented sufficient evidence to create a genuine issue

of material fact with respect to pretext:

> [T]o defeat summary judgment when the [employer] [articulates]
> legitimate non-discriminatory reasons for its action, the plaintiff
> must point to some evidence, direct or circumstantial, from which
> a factfinder could reasonably either (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that an invidious
> discriminatory reason was more likely than not a motivating or
> determinative cause of the employer's action.

*Fuentes*, 32 F.3d at 764; *see Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 370 (3d Cir. 2008)

("Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's

proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the

employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise

did not actually motivate the employment action (that is, that the proffered reason is a pretext).").

The two prongs of the *Fuentes* test are distinct.  The court will analyze both prongs of the

*Fuentes* test to determine whether sufficient evidence was presented by plaintiff to defeat

defendant's motion for summary judgment.  *See Keller v. Orix Credit Alliance, Inc.,* 130 F.3d

1101, 1108-13 (3d Cir. 1997) (analyzing ADEA action under both prongs of *Fuentes*

framework).

### (a) Prong one of *Fuentes* test

Prong one of the *Fuentes* test focuses on whether a plaintiff submitted evidence from which a fact-finder could reasonably disbelieve the defendants' articulated legitimate reasons for the plaintiff's termination.  Under this prong, the plaintiff must point to:

> weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action.

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998).  The district court under this prong must focus on the legitimate, nondiscriminatory reason offered by the employer.  *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992) (stating that a "plaintiff does not establish pretext, however, by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon . . . .").  The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination.  *Id*. at 527.

Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it.  For example, in *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326 (3d Cir. 1995), the plaintiff was terminated for deficient sales performance.  The evidence of record, however, disclosed that the plaintiff received a bonus three months before he was fired and that he was the only sales representative in the region who had received such a bonus.  *Id*. at 329. The court held that, where the primary measure of the plaintiff's performance was sales and he

was the leading salesperson in the region, his employer's stated reason for his termination was contradictory to its admission that the most important standard of job performance is sales.  *Id*. at 332.  According to the court, "[a] fact-finder could find it implausible that [the employer] would have fired [the plaintiff] for such deficiencies when he was successful in the sole area identified by [the employer]'s own performance incentive program – sales."  *Id*.

Similarly, in *Sempier v. Johnson and Higgins*, 45 F.3d 724 (3d Cir. 1995), the employer stated that Sempier was terminated based upon poor performance that caused the company to restructure the nature of his responsibilities.  The evidence of record, however, disclosed that (1) Sempier never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of Sempier's deficiencies.  *Id*. at 731-33.  Thus, there was evidence on the record that a reasonable fact-finder could conclude that the reason given by Sempier's employer was a pretext for age discrimination.  *Id*. at 732-33.

It is not the function of this court to determine whether defendants' business judgment in terminating plaintiff was correct.  In *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207 (3d Cir. 2000), the Court of Appeals for the Third Circuit explained that an employer is permitted "to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct."  *Id*. at 222.  As an example, the court of appeals stated:

> if an employer sincerely believes that an employee has stolen company funds and discharges the employee for this reason, the employer should not be held liable under the [employment discrimination statutes in question] just because it turns out that the employee did not steal the funds and that the employer's reason for the discharge was in this sense not "true."

*Id.*  The inquiry must focus upon "the perception of the decision maker."  *Billet v. Cigna Corp.*, 940 F.2d 812, 825 (3d Cir. 1991).  The defendants only needed an honest belief that the incidents occurred.  *Watson*, 207 F.3d at 222.

Defendant argues that Wildi was terminated for strictly financial reasons. It relies on numerous factual allegations, such as the terminations of other employees, decreases in merit bonuses that reflected a dip in revenue, and numerous meetings discussing the financial downturn the hospital faced. Wildi, however, argues that the other terminations were not based upon financial reasons. Wildi asserts that the four positions that were terminated prior to her termination would not have eased the financial situation the hospital was facing. As stated in *Cigna Corp.*, the inquiry must focus on the perception of the decision-maker; in this case, Schamp and arguably the other members of the senior management team felt actions had to be taken to ease the financial strains. Plaintiff's own opinion that the elimination of the positions would not have helped the situation is not supported by any evidence, other than hearsay,[2] and there is no evidence that defendant or the senior management team did not sincerely hold the belief that the elimination of jobs would relieve the financial difficulties.  Wildi's disagreement with the decision to terminate four lower positions and her belief that there were alternatives that would have saved costs does not prove that defendant did not honestly believe its stated reason for the decision. Plaintiff points out that defendant only eliminated four lower-ranking positions as evidence that its stated business reason is pretext, but this is not evidence that the elimination of positions did not reduce defendant's costs, especially since plaintiff's higher paying position was also eliminated.  Similarly, that defendant continued to pay large salaries and bonuses to

---

[2] Hearsay statements not capable of being admitted at trial cannot be considered in resolving a motion for summary judgment.  *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n.1 (3d Cir. 1996).  Plaintiff did not present evidence that any hearsay exception is applicable.  There is no evidence that any statement was "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED. R. EVID. 801(d)(2)(D).

executives also does not disprove that the elimination of plaintiff's position was financially beneficial for defendant. Finally, Wildi does not dispute that there was a serious financial strain on defendant occurring throughout the relevant time span; she offers no evidence supporting a conclusion that the hospital was not financially struggling.  Plaintiff, therefore, did not adduce sufficient evidence under the first prong of *Fuentes*.

### (b) Prong two of *Fuentes* test

The court is next required to examine the second prong of the *Fuentes* framework to determine if plaintiff presented sufficient evidence of pretext.  This prong permits the plaintiff to survive summary judgment if he or she can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762.  With respect to this prong, the United States Court of Appeals for the Third Circuit has stated:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with *sufficient probative force* that a factfinder could conclude by a preponderance of the evidence that [the protected activity] was a motivating or determinative factor in the employment decision.

*Simpson*, 142 F.3d at 644-45 (emphasis added).  The court of appeals directed that the kinds of evidence that may be relied upon under this prong of the *Fuentes* analysis are: (1) whether the employer previously discriminated against the plaintiff, (2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, and (3) whether the employer has treated more favorably similarly situated persons not within the protected class. *Id.*

**(i) Previous discrimination against plaintiff**

Wildi presented no evidence that she was previously retaliated against for complaining about defendant's pay structure.  Plaintiff did not raise any arguments under this prong of the *Fuentes* test. The only evidence of record of any type of discrimination is the evidence supporting her Equal Pay Act claim.  Plaintiff argues that gender was the reason why the three male vice-presidents were paid more than her.  The discriminatory conduct relevant to her Equal Pay Act claim, however, forms the basis of count II – under count II, she claims she was retaliated against for complaining about the pay structure that violated the Equal Pay Act. Plaintiff argues she was retaliated against for complaining about defendant's discriminatory conduct, but the very conduct which prompted the retaliation does not implicate "previous discrimination."  Plaintiff did not cite any case law that holds the conduct complained of is adequate evidence of pretext in a retaliation case.  Under these circumstances, the evidence of record lacks sufficient probative force for a reasonable jury to conclude that plaintiff's complaints about unequal pay motivated or was a determinative factor in defendant's decision to terminate her.  There is no evidence of record of a prior history of gender-based discrimination.

Plaintiff argues throughout her time at Alle-Kiski, Schamp treated her differently than the male vice-presidents. Wildi argues that Schamp left her out of meetings and out of certain office decisions. Wildi, however, did not present evidence the male vice-presidents had no work-related reasons to attend the meeting from which she was excluded or that her work duties required her as well as the male vice-presidents to be present at those meetings. Plaintiff may have "felt excluded by her coworkers or unsupported by her managers," but "social unpleasantries . . . cannot give rise to an inference of unlawful discrimination where not one single [gender]-based comment is alleged and there is no logical inference that the comments made were, in fact,

[gender]-based." *Williams-McCoy v. Starz Encore Group*, No. 02-5125, 2004 WL 356198, at *8 (E.D. Pa. Feb. 5, 2004).

### (ii) Discrimination against others

Plaintiff did not argue that defendant discriminated against others within her protected class. Wildi did not proffer any evidence to suggest that other employees who complained about their salaries were also terminated or retaliated against. In addition, plaintiff did not point to any evidence of other Equal Pay Act violations.

### (iii) Other employees treated more favorably

Wildi did not adduce sufficient evidence to establish that other employees not in the protected class were more favorably treated. Wildi did not produce evidence suggesting that male employees who complained about pay were differently treated.  There was no evidence that any male made complaints about their salaries and were not terminated.  Wildi alleges the other three vice-presidents were treated differently from her because they were paid more for performing similar work.  Those allegations are the very matters she complained about.  As discussed previously, there is a lack of evidence of sufficient probative force to show that males who complained about unequal pay were treated differently.

Viewing all the evidence relevant to the second prong of the *Fuentes* analysis, the court determines that plaintiff did not adduce sufficient evidence to create a genuine issue of material fact that defendant's stated legitimate business reason is a pretext for retaliation.  Summary judgment will therefore be granted with respect to count II.

*Conclusion*

Upon consideration of the motion for summary judgment filed by defendant Alle-Kiski and the parties' submissions with respect to the motion, the court will deny Alle-Kiski's motion for summary judgment with respect to count I (claiming violation of the Equal Pay Act), and will grant the motion with respect to count II (claiming retaliation under 29 U.S.C. § 215(a)(3)).

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Date: September 18, 2009